**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

_____

| | |
|---|---|
| Ronnie Burrus,                 ) | |
|                 ) | |
|         Petitioner,    ) | **CIVIL ACTION** |
|                 ) | |
|     v.               ) | _____ |
|                 ) | |
| United States of America,   ) | |
|                 ) | |
|         Respondent.   ) | |
|                 ) | |

_____

**PETITIONER RONNIE BURRUS'S MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY**

Dated:  February 12, 2024

Robert M. Kimmitt, Jr.
robert.kimmitt@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Fax: (202) 389-5200

_ATTORNEY FOR PETITIONER_
_RONNIE BURRUS_

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

ISSUE STATEMENT ........................................................................................................... vi

I.  INTRODUCTION ....................................................................................................... 1

II. FACTUAL BACKGROUND ...................................................................................... 1

    A.  The Indictment ................................................................................................... 1

    B.  Swanson Appointed as Counsel ........................................................................ 2

    C.  The Plea Agreement .......................................................................................... 3

    D.  Sentencing ......................................................................................................... 5

    E.  Direct Appeal .................................................................................................... 7

III. INEFFECTIVE ASSISTANCE OF COUNSEL ...................................................... 7

    A.  Swanson Falsely Stated Burrus's Codefendants Were Cooperating
        and Would Testify Against Him, and Neglected to Investigate This
        Claim ................................................................................................................. 8

        1.  Facts. ....................................................................................................... 8

        2.  Analysis. ................................................................................................10

        3.  *Giardino*: A Special Case Involving an Incorrect Assertion of a
            Cooperating Codefendant ..................................................................... 11

    B.  Swanson Failed to Provide the Alleged Victim's Medical Records and
        Failed to Investigate Whether Those Records Existed ................................... 12

        1.  It Was Unreasonable for Swanson to Not Investigate the Alleged
            Victim's Medical Records Prior to Burrus's Plea Agreement and in
            Preparation for Trial. ............................................................................ 13

        2.  Swanson Failed to Provide Burrus a Copy of the Medical Records,
            Despite Multiple Requests, Denying Burrus the Ability to Make an
            Informed Guilty Plea. ........................................................................... 17

    C.  Swanson Gave Burrus Incorrect Advice Regarding Charges and
        Federal Sentencing .......................................................................................... 18

        1.  Facts. ..................................................................................................... 18

   2.  Analysis ................................................................................... 22

   3.  Alternatively, Swanson Failed to Provide Any Sentencing
     Prediction. .............................................................................. 25

  **D.**  **Swanson Failed to Present Any Mitigation Evidence at Sentencing** ............. 27

  **E.**  **Swanson Rarely Visited Burrus in Prison** ........................................................ 29

  **F.**  **Swanson Allowed Continuances Despite Burrus's Many Requests for
    a Speedy Trial** ........................................................................................................ 31

**IV.** **APPEAL WAIVER** ................................................................................................... 33

  **A.**  **The Appeal Waiver in Burrus's Plea Agreement Does Not Preclude
    This Petition** ........................................................................................................... 33

**V.** **REMEDY** .................................................................................................................. 35

  **A.**  **Burrus Is Entitled to Vacatur or, At Least, an Evidentiary Hearing** ............ 35

**VI.** **CONCLUSION** ........................................................................................................ 36

**INDEX OF EXHIBITS** ..................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Bertrand,*
453 F.3d 428 (7th Cir. 2006) ..............................................................16

*Alliet v. Wallace,*
No. 05-C-659-C, 2006 WL 456268 (W.D. Wis. Feb. 23, 2006) ............12

*Anderson v. United States,*
981 F.3d 565 (7th Cir. 2020) ..............................................................35

*Bethel v. United States,*
458 F.3d 711 (7th Cir. 2006) ..............................................................25

*Bruce v. United States,*
256 F.3d 592 (7th Cir. 2001) ..............................................................35

*Emerson v. Gramley,*
91 F.3d 898 (7th Cir. 1996) ................................................................28

*Evans v. Meyer,*
742 F.2d 371 (7th Cir. 1984) ..............................................................18

*Gaylord v. United States,*
829 F.3d 500 (7th Cir. 2016) ..............................................................35

*Hill v. Lockhart,*
474 U.S. 52 (1985).................................................................... *passim*

*Hurlow v. United States,*
726 F.3d 958 (7th Cir. 2013) ..............................................................33

*Julian v. Bartley,*
495 F.3d 487 (7th Cir. 2007) .........................................................25, 26

*Key v. United States,*
806 F.2d 133 (7th Cir. 1986) ..............................................................12

*Kubat v. Thieret,*
867 F.2d 351 (7th Cir. 1989) ..............................................................28

*Lee v. United States,*
113 F.3d 73 (7th Cir. 1997) ................................................................35

*Miller v. Martin*,
   481 F.3d 468 (7th Cir.), *as amended,* 223 F. App'x 489 (7th Cir. 2007) ..............................27

*Moore v. Bryant*,
   348 F.3d 238 (7th Cir. 2003) ........................................................ *passim*

*Strickland v. Washington*,
   466 U.S. 668 (1984).................................................................... *passim*

*Sullivan v. Fairman*,
   819 F.2d 1382 (7th Cir. 1987) ................................................................8

*U.S. v. Cureton*,
   739 F.3d 1032 (7th Cir. 2014) ..............................................................19

*United States v. Barnes*,
   83 F.3d 934 (7th Cir. 1996) .............................................................23, 26

*United States v. Burrus*,
   No. 21-2671, App. Br. (7th Cir. Apr. 13, 2022) ..................................35

*United States v. Burrus*,
   No. 1:17-cv-00007-DRL-SLC (N.D. Ind.) ............................................2

*United States v. Cronic*,
   466 U.S. 648 (1984)..............................................................................27

*United States v. Day*,
   969 F.2d 39 (3d Cir. 1992).....................................................................35

*United States v. Giardino*,
   797 F.2d 30 (1st Cir. 1986).....................................................................11

*United States v. Martinez*,
   169 F.3d 1049 (7th Cir. 1999) ..........................................................16, 26

*United States v. Masters*,
   978 F.2d 281 (7th Cir. 1992) ...................................................................5

*United States v. Winston*,
   34 F.3d 574 (7th Cir. 1994) ...................................................................12

*Williams v. Washington*,
   59 F.3d 673 (7th Cir. 1995) ...............................................................8, 13

**Statutes**

18 U.S.C. § 924 ............................................................................................1, 4, 7, 19

18 U.S.C. § 1959 ................................................................................................. *passim*

28 U.S.C. 2255 ........................................................................................1, 9, 11, 35

U.S.S.G. § 2E1.1 ...........................................................................................................5

U.S.S.G. § 2E1.3 .......................................................................................................5, 22

**Other Authorities**

*Allen County's Chief Public Defender Reinstated After Weeks Long Suspension*, WANE
    15 WANE.COM (Feb. 11, 2022), https://www.wane.com/news/local-news/allen-
    countys-chief-public-defender-reinstated-after-weeks-long-suspension/ ..................................2

Corryn Brock, *Allen County Public Defender's Office Mourning Loss of
    Colleague Killed in Grabill*, 21 ALIVE NEWS (Feb 5, 2024),
    https://www.21alivenews.com/2024/02/05/allen-county-public-defenders-
    office-mourning-loss-colleague-killed-grabill/ ........................................................................10

Joe Carroll, *Former Police Officer Apologizes During Sentencing for Theft*,
    WANE 15 WANE.COM (Mar. 17, 2016), https://www.wane.com/news/former-
    police-officer-apologizes-during-sentencing-for-theft/ ...........................................................17

## ISSUE STATEMENT

1.   Whether Ronnie Burrus received ineffective assistance of counsel after his trial counsel told him incorrectly that his co-defendants were cooperating with the prosecution, gave him incorrect advice on federal sentencing law, and failed to investigate key evidence, among other errors.

2.   Whether Ronnie Burrus was prejudiced by his trial counsel's ineffective performance such that he lost his Sixth Amendment right to try his case before a jury.

3.   Whether, given the violation of Ronnie Burrus's Sixth Amendment rights, the Court should vacate his sentence or, alternatively, grant him an evidentiary hearing under 28 U.S.C. § 2255.

## I.  INTRODUCTION

Petitioner Ronnie D. Burrus, through his undersigned counsel, brings this Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct His Sentence.  Burrus pleaded guilty to two counts of attempted assault with a dangerous weapon and one count of assault with a dangerous weapon, all in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(3) & (6); and to three counts of discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  The District Court sentenced Mr. Burrus to 360 months in prison.  The Court of Appeals for the Seventh Circuit vacated the sentence in part, merging three counts but not lessening the period of incarceration.  Because the guilty plea was entered on the advice of ineffective trial counsel, who failed to properly investigate, misunderstood the charges and basic sentencing law, and conveyed inaccurate information in the days ahead of the change-of-plea hearing, Mr. Burrus was prejudiced through forfeiture of his Sixth Amendment right to effective counsel.  Had Mr. Burrus been fully informed of the charges against him and received factually correct information, he would not have pleaded guilty and instead would have gone to trial.  Accordingly, Mr. Burrus respectfully requests the Court enter an order vacating his conviction and sentence or, in the alternative, hold an evidentiary hearing to examine these claims.

## II.  FACTUAL BACKGROUND

### A.  The Indictment

On February 22, 2017, the United States filed an 18-count indictment against four defendants: Demetri Beachem, William Beamon, Kyombe Bolden, and Ronnie Burrus.  Each count related the Government's allegation that the defendants participated in criminal activity as members of the "2500" or "2500 Block" gang in Fort Wayne, Indiana.  The Government acknowledged that 2500 was not a major criminal enterprise, but rather a fluid group grounded in relationships formed through growing up together in the same neighborhood of Fort Wayne.

The charges stemmed from a shooting that occurred on October 4, 2014. That day, the Government alleged, Messrs. Beachem, Beamon, Bolden, and Burrus sought out rival gang members in response to social media posts. They located two rival gang members—J.S. and F.B.—and fired on them as they exited a house. Approximately 50 rounds were discharged at the scene, but none of the bullets hit the two rival gang members. Instead, the gunfire hit a vehicle and two nearby houses. According to the Government, a stray bullet grazed the finger of one of the houses' occupants—S.E.[1]

Burrus was arrested on August 2, 2017 and placed into pretrial detention, where he remained for nearly three years. William S. Lebrato was appointed as his stand-by counsel for pretrial detention proceedings because Mr. Burrus initially elected to represent himself. ECF Doc. No. 55.[2]. On January 20, 2018, Lebrato requested that the court appoint him as Burrus's full-time counsel, which the Court allowed. However, the relationship quickly soured. Indeed, on July 31, 2018, Mr. Burrus informed the Court that he had not heard from Lebrato "in 6 months," despite many attempts to write and call him. ECF Doc. No. 135. Roughly three weeks later, Lebrato withdrew as Mr. Burrus's attorney.[3]

B.    Swanson Appointed as Counsel

---

[1]    S.E.'s real name appears several times in the criminal case records. Out of an abundance of caution, we continue to use her initials for anonymity purposes, as well as those of F.B. and J.S.

[2]    All ECF docket numbers are for the underlying criminal case before this Court, *United States v. Burrus*, No. 1:17-cv-00007-DRL-SLC (N.D. Ind.).

[3]    According to multiple media reports, William Lebrato was suspended from his current role as chief public defender for "two to three" weeks for undisclosed reasons. One member of the Allen County Public Defender Board voted against his reinstatement. *Allen County's Chief Public Defender Reinstated After Weeks Long Suspension*, WANE 15 WANE.COM (Feb. 11, 2022), https://www.wane.com/news/local-news/allen-countys-chief-public-defender-reinstated-after-weeks-long-suspension/.

On August 22, 2018, Donald Swanson was appointed Mr. Burrus's attorney pursuant to the Criminal Justice Act. Mr. Burrus languished in pretrial detention for over 31 months. Trial was delayed due to multiple continuances sought by his codefendants (and at times unchallenged by Mr. Swanson), who repeatedly changed legal representation. During this time, Swanson corresponded with Mr. Burrus via occasional letters and rarely visited him in jail, despite Mr. Burrus's frequent requests for face-to-face discussions. Mr. Burrus was anxious to go to trial to contest the charges. After significant delays, trial was set for December 2, 2019. Counsel Swanson informed Mr. Burrus that he had objected to a new motion for continuance put forth by one of his codefendants. Mr. Burrus later discovered this was not true, further damaging an already fraught attorney-client relationship. At Mr. Burrus's request, Mr. Swanson sought to withdraw as counsel in December 2019. The magistrate judge held a hearing on Swanson's motion, but Swanson withdrew the motion after reconsideration and remained Mr. Burrus's attorney.

## C.    The Plea Agreement

On February 24, 2020, counsel Swanson drafted a letter notifying Mr. Burrus of a plea offer from the Government. Ex. 3.[4] However, this letter contained two key errors: (1) it did not contain a copy of the plea agreement, despite saying it was enclosed, and (2) it mischaracterized what Mr. Burrus would to plead to. Swanson's letter said Mr. Burrus would "plead[] guilty to attempted assault with a dangerous weapon and the 924(c) count" in exchange for the Government "dropping the attempt[ed] murder counts and the remaining counts as well." *Id.*

---

[4]    Counsel here discloses certain correspondence between Mr. Burrus and prior counsel Donald Swanson for the narrow purpose of exhibiting Mr. Swanson's deficient performance. Mr. Burrus explicitly retains privilege over all other materials. Any disclosure of attorney-client communications outside of this narrow purpose is inadvertent. Mr. Burrus does not consent to Mr. Swanson disclosing any other communications between them—written or oral—or any attorney work product created for Mr. Burrus's case.

Mr. Burrus reasonably understood this to mean that the Government was dropping Count 13, assault with a dangerous weapon. However, the actual agreement *did* include the assault with a deadly weapon charge. Mr. Swanson never visited Mr. Burrus in jail to discuss the Government's offer, so there was no opportunity for him to clarify or explain the charge ahead of the March 6, 2020 change of plea hearing. Thus, the first time Mr. Burrus laid eyes on the actual plea agreement was during the short time period that he met with his counsel prior to the hearing—approximately 10-20 minutes according to Mr. Burrus's recollection. During this short meeting, Mr. Burrus's attorney told him that he was facing between 10 and 13 years in prison if he accepted the plea—which conformed to the statutory range for attempted assault with a dangerous weapon and § 924(c) firearms charges. So, not only did Mr. Burrus walk into the hearing without a clear understanding of what sentence he was actually facing, he was unclear on what charges he was even pleading to.

This problematic circumstance was compounded by another grievous error: Mr. Burrus's counsel wrote him another letter—this one on February 28, 2020—reporting that he had "received information that two of your codefendants have entered into a plea agreement with the Government" and "have agreed to cooperate and testify against you." Ex. 4. Swanson said he would submit a "formal request for information regarding their plea, including the cooperation clause" and would be in touch as soon as he had more information. *Id.* As it turned out, *none of Burrus's codefendants were cooperating with the Government.* ECF Doc. No. 497 at 41:3-7.[5] Again here, Swanson did not follow up with Mr. Burrus until just prior to his change of plea

---

[5] Per AUSA Anthony Geller: "Something also that strikes me about this case, is none of the defendants cooperated. They don't have to, certainly, but they certainly have that option. I know I presented that option a number of times, but they stayed solid as gang members." ECF Doc. No. 497 at 41:3-7.

hearing March 6, 2020. And there is no evidence that Swanson took any investigatory steps to verify what he told Mr. Burrus.

Based on a mix of assurances and warnings from his attorney—nearly all of which turned out to be inaccurate—Burrus appeared before the Court on March 6, 2020 and entered a plea of guilty, not realizing he was pleading to assault with a dangerous weapon. This charge alone carries a 20-year maximum sentence. The Court accepted Burrus's plea.

### D. Sentencing

The Final Presentence Report was filed in May 2020. Contrary to Swanson's assurances to Burrus, the Presentence Report calculated Burrus's Sentencing Guidelines based on the attempted-murder conduct set out in the plea agreement. Burrus's sentencing memorandum of September 18, 2020, stated, "This was not Burrus['s] understanding of the plea *nor was it the factual plea that was explained by counsel to him*." ECF Doc. No. 374 at 2 (emphasis added). The memorandum, authored by Swanson, argued that the Government was "estopped at this juncture" from arguing for the attempted-murder guideline.

The Court overruled Burrus's objections in full and rejected Swanson's arguments. The Court cited the Seventh Circuit's opinion in *United States v. Masters*, 978 F.2d 281, 284 (7th Cir. 1992), which held that to determine the "underlying racketeering activity" referenced in U.S.S.G. § 2E1.1, "the court looks at the whole offense, not just the offense of conviction." ECF Doc. No. 394 at 11. Though *Masters* dealt with RICO offenses under U.S.S.G. § 2E1.1 instead of VICAR offenses under U.S.S.G. § 2E1.3, the Court found the case to be directly applicable "because the language of the cross-references remains the same." *Id.* at 12. Thus, the Court held that *Masters* and other cases, together with the plain text of the sentencing guidelines, "direct the court to apply the offense level based on the 'underlying racketeering activity'"—here, attempted murder instead of attempted assault. *Id.* at 12.

Meanwhile, Burrus had been attempting to correspond with Swanson regarding key evidence to help his case. Complaining that he had not seen all necessary discovery yet, Burrus sent Swanson multiple letters asking him to investigate further into the medical records for the victim who was allegedly hit by a stray bullet in the gang-related shooting at the heart of the charges. Despite multiple requests from his client to do so, Swanson never investigated the victim's medical records.

In April 2021, realizing the full ramifications of his plea agreement, Mr. Burrus filed a motion to withdraw his guilty plea. He argued that he had been "advised by counsel that the attempted murder predicate would be dismissed," and that the Assistant United States Attorney also represented that "the attempted murder predicates would be dismissed." ECF Doc. No. 423 at ¶¶ 6 & 7. Mr. Burrus argued he pleaded guilty "in reliance that the guideline range would be for attempted assault rather than attempted murder." *Id.* at 8. The Court denied Burrus's motion to withdraw his guilty plea.

In the months prior to the sentencing hearing, Burrus continued writing letters to Swanson asking for help. He pleaded with Swanson to admit at sentencing that "you advised me that I would only get 10-13 years in prison. I understand that you had no control over the attempted murder but I would not have signed the plea if you did not tell me that so I am asking as my lawyer to state for the record that this conversation took place." Ex. 8. He also asked Swanson to call the alleged victim S.E. as a witness at sentencing to testify as to whether she was hit by a bullet. Ex. 9. In Burrus's words, he was "trying to make sense of what I pled guilty to." *Id.*

Sentencing was held on August 27, 2021 before the Honorable Damon R. Leichty. In his statement before the Court, Mr. Burrus recounted counsel Swanson telling him "on March 6,

2020, that I would be sentenced to 10 to 13 years . . . .  He also told me that my co-defendants agreed to cooperate against me, and I found all these things to be untrue."  ECF Doc. No. 497 at 19:8-13.  Burrus also brought up his concerns regarding Swanson's failure to investigate, that he had "been asking my attorney for quite a long time for the medical records of the alleged victim that was shot in this case" but never received them.  *Id.* at 23:8-10.  However, the Government said at that time, "As far as the medical records, today is the first day anybody has ever even mentioned those.  No attorney has ever asked me for medical records of the victim." *Id.* at 26:6-8.  The Court calculated the sentencing guidelines range based on attempted murder as the underlying racketeering conduct and sentenced Burrus to 30 years in prison.

### E.    Direct Appeal

Burrus filed a notice of appeal on September 10, 2021.  A few days later, Mr. Swanson filed a motion to withdraw as counsel.  The Seventh Circuit granted Swanson's motion to withdraw and appointed attorney Nicholas Gallagher as Mr. Burrus's appellate counsel.  The appeal was heard by a three-judge panel of the Seventh Circuit on November 7, 2022.  In a nonprecedential disposition issued on November 15, the Seventh Circuit vacated part of Burrus's sentenced and remanded the case with instructions to merge the § 924(c) sentences into a single conviction.  Burrus's sentence was otherwise affirmed, and there was no reduction in prison term.

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment guarantees the accused "the Assistance of Counsel for his defence."  In *Strickland v. Washington*, the Supreme Court provided a floor above which counsel must perform in order to meet this constitutional guarantee of adequate defense.  466 U.S. 668, 685 (1984).  The *Strickland* test says that the defendant must show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Id.*

at 687. "In order to demonstrate ineffective assistance of counsel in the context of a guilty plea, [defendant] must demonstrate that his counsel's advice regarding the plea was objectively unreasonable and that there is a reasonable probability that, but for counsel's error, [defendant] would not have pled guilty, but would have insisted upon a trial." *Moore v. Bryant*, 348 F.3d 238, 241 (7th Cir. 2003) (citing *Hill*, 474 U.S. at 59; *Strickland*, 466 U.S. 668).

Further, defendant's counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "In assessing allegations that an attorney failed to investigate, we must determine whether counsel's decision to investigate or his determination that particular investigations were unnecessary was objectively reasonable." *Williams v. Washington*, 59 F.3d 673, 679 (7th Cir. 1995) (citing *Sullivan v. Fairman,* 819 F.2d 1382, 1391 (7th Cir. 1987). At a minimum, "[c]ounsel has a duty to conduct an independent investigation of his client's case or to articulate a strategic reason for his failure to do so." *Id.* at 680.

### A. Swanson Falsely Stated Burrus's Codefendants Were Cooperating and Would Testify Against Him, and Neglected to Investigate This Claim

Mr. Burrus's representation by counsel was ineffective because his attorney Donald Swanson: (1) informed Mr. Burrus that two codefendants were cooperating against him despite this being false and (2) did not investigate this claim. Despite his factual innocence on several predicates and elements of the crimes with which he was charged, Mr. Burrus was dispirited and feared a lengthy prison sentence that could come if these codefendants testified against him. In direct response to this information, Mr. Burrus pleaded guilty—only later discovering that it was untrue.

1.    Facts.

Mr. Burrus repeatedly told his attorney that he wanted to go to trial. Ex. 1 at ¶ 7. He said it so often that his attorney wrote in a March 12, 2019 letter, "I will not trouble you further with plea negotiations because I understand your position." Ex. 10.

On February 28, 2020, Swanson sent Mr. Burrus a letter stating that two of his codefendants had entered into a plea agreement. Swanson continued, "It is my understanding they both have agreed to cooperate and testify against you." Ex. 4. Swanson then assured Mr. Burrus that he would be in touch with more information when he had it. *Id.*

In fact, Mr. Burrus heard nothing further from Mr. Swanson until seeing him at the courthouse just prior to his change of plea hearing on March 6, 2020. At that time, Swanson again informed Mr. Burrus that two codefendants (Kyombe Bolden and William Beamon) were cooperating with the Government and would be testifying against him. Ex. 1 at ¶¶ 8-9. He also said that he verified this information with both of their attorneys.

We now know this is not true. At Mr. Burrus's August 27, 2021 sentencing hearing, Assistant United States Attorney Anthony Geller said:

> Something also that strikes me about this case, is *none of the defendants cooperated*. They don't have to, certainly, but they certainly have that option. I know I presented that option a number of times, but they stayed solid as gang members. They, you know, they could have cooperated against their fellow gang members. Frankly, we brought this up to them, too; they could have simply cooperated against the Mafia members and help us solve some of the shootings the Mafia members perpetrated also. We end up with none of that.

> ECF Doc. No. 497 at 41:3-12 (emphasis added).

Mr. Swanson stated that he does not remember where he heard that Bolden and Beamon were cooperating, but there is evidence that he did not investigate the claim. Ex. 33 at ¶ 9. After being contacted as part of the investigation for this § 2255 action, Kyombe Bolden's trial attorney Marcia Linsky said, "My client Mr. Bolden never agreed to cooperate. Not when he was first arrested for the gun charge or when they brought up these gang related charges." Ex.

11. When asked if Mr. Burrus's counsel Swanson ever asked her if her client was cooperating, she said, "I don't recall him asking me directly, no." *Id.*[6]

        2.        Analysis.

The *Strickland* standard for ineffective assistance of counsel is that (1) the defense attorney's performance was objectively deficient and (2) that there was a reasonable probability that a competent attorney would have led to a different outcome. 466 U.S. at 687.

*Hill v. Lockhart* applied this standard to cases where the defendant pleaded guilty:

> In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

474 U.S. 52, 59 (1985).

That is exactly the case here. We do not know the source of Swanson's assertion the Mr. Burrus's codefendants were cooperating. Ex. 33 at ¶ 9. We do know that it was incorrect, and that Swanson did not perform investigation necessary to verify this key assertion. Swanson passed this uninvestigated, uncorroborated, incorrect information on to Mr. Burrus, and Mr. Burrus relied on it when making his plea determination.[7]

---

[6]    Marcia Linsky tragically died on or around February 3, 2024. We do not have a sworn declaration memorializing her statement, so email correspondence from February 1, 2024 containing these statements is attached hereto as Ex. 11. Corryn Brock, *Allen County Public Defender's Office Mourning Loss of Colleague Killed in Grabill*, 21 Alive News (Feb 5, 2024), https://www.21alivenews.com/2024/02/05/allen-county-public-defenders-office-mourning-loss-colleague-killed-grabill/.

[7]    Mr. Burrus asked if he could take the weekend to discuss the plea deal with his family, as he did not have sufficient time to review and understand the plea. Mr. Swanson said he could not, thus exacerbating this rushed, misinformed decision. Ex. 1 at ¶ 11.

But for the relaying of this incorrect information, Mr. Burrus would not have pleaded guilty. Ex. 1 at ¶ 17. Swanson said on several occasions—prior to this belief—that the Government did not have a good case against Mr. Burrus, best encapsulated in Swanson's September 26, 2019 letter: "As I have indicated to you all along, unless one of your club members agrees to testify, the Government's case is very weak against specifically you." Ex. 12. This statement makes it self-evident that "discovery of the evidence [that there were in fact no cooperating codefendants] would have led counsel to change his recommendation as to the plea." *Hill* at 59. However, it is also clear that having cooperating codefendants versus not having them "likely would have changed the outcome of a trial." *Id.* Thus, the prejudice prong of *Strickland* is satisfied.

3.  *Giardino*: A Special Case Involving an Incorrect Assertion of a Cooperating Codefendant

*United States v. Giardino* is remarkably similar to the present case. 797 F.2d 30 (1st Cir. 1986) (Breyer, J.). There, defendant Giardino was apprehended after being in the proximity of Masone, who was caught selling cocaine to a government agent. Giardino's attorney told him that his codefendant Masone made incriminating statements regarding Giardino to the government, saying that Giardino was the person who originally procured the drug in question. Based on this information, Giardino pleaded guilty. It was not until later that Giardino discovered this was not correct. According to Giardino and Masone, Masone never made such statements and, in fact, would have testified that Giardino was an innocent bystander. *Id.* at 31.

Then-Circuit Judge Stephen Breyer sided with Giardino in his § 2255 collateral appeal, ordering an evidentiary hearing to examine Giardino's claims because "summary dismissal of Giardino's motion was inappropriate." *Id.* at 32. The court said that the alleged attorney

conduct "falls 'below an objective standard of reasonableness.'" *Id.*, quoting *Hill v. Lockhart* at 57 (internal quotations omitted).[8]

There is a dearth of other cases—within the Seventh Circuit and otherwise—that involve defendants pleading guilty based on false information from their attorneys that codefendants were cooperating. However, two cases in the Seventh Circuit, one by the Court of Appeals and one by the Western District of Wisconsin, cite favorably to *Giardino*'s ruling that belief in a key fact that a defendant later learns is false can negate Rule 11 plea colloquy. *See United States v. Winston*, 34 F.3d 574, 578 (7th Cir. 1994); *Alliet v. Wallace*, No. 05-C-659-C, 2006 WL 456268, at *7 (W.D. Wis. Feb. 23, 2006).[9]

### B. Swanson Failed to Provide the Alleged Victim's Medical Records and Failed to Investigate Whether Those Records Existed

Burrus's counsel was ineffective because counsel failed to investigate the medical records of the alleged victim to confirm that she had in fact been hit by a stray bullet connected to the shooting, despite multiple requests by Burrus and promises by counsel to do so.

Under the Sixth Amendment, a defendant's counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

---

[8] The Giardino case did involve an allegation of deceit against his attorney. Although we have no evidence of deceitful intent regarding Swanson's cooperation claim, Swanson appears to have deceived his client on at least two occasions: He said that he asked the Government for one of the alleged victim's medical records, but the government claimed he did not. He also informed his client that he objected to a codefendant's motion for continuance when in fact the motion was unopposed. These are discussed further below.

[9] Another Seventh Circuit case cited somewhat unfavorably to a different portion of *Giardino*'s ruling. *Key v. United States* said that "merely making bare allegations" that a defendant-petitioner would have pleaded differently is insufficient. 806 F.2d 133, 139 (7th Cir. 1986). However, we make no such assertion here and do not use *Giardino* to support it. Mr. Burrus herein through counsel provides evidence beyond mere allegation in each instance to support the second prong of *Hill v. Lockhart*—that he would have pleaded differently and gone to trial.

unnecessary." *Strickland*, 466 U.S. at 691. "In assessing allegations that an attorney failed to investigate, we must determine whether counsel's decision to investigate or his determination that particular investigations were unnecessary was objectively reasonable." *Williams*, 59 F.3d at 679. At a minimum, "[c]ounsel has a duty to conduct an independent investigation of his client's case or to articulate a strategic reason for his failure to do so." *Id.* at 680. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland* 466 U.S. at 691.

      1.     It Was Unreasonable for Swanson to Not Investigate the Alleged Victim's Medical Records Prior to Burrus's Plea Agreement and in Preparation for Trial.

Mr. Burrus was charged, *inter alia*, with assault with a dangerous weapon under VICAR (Count 13) on an individual referred to as "S.E." ECF Doc. No. 1. This offense carried a maximum sentence of 20 years imprisonment—far more than any of the other offenses with which Mr. Burrus was charged. 18 U.S.C. § 1959(a)(3). From the date of his arrest to the present day, Mr. Burrus has maintained his factual innocence regarding several aspects of this case but of this charge in particular. In his sentencing memorandum filed June 29, 2020, Mr. Burrus through his counsel said, "At the outset it is important to note that Ronnie was not the shooter in either of the predicate offenses." ECF Doc. No. 344 at 1. In a letter to Swanson on March 19, 2021, Mr. Burrus said, "I want to withdraw my plea because I am factual[ly] innocent of count 13 assault S.E. with a dangerous weapon." Ex. 7. Mr. Burrus filed a letter with the Court March 30, 2021 requesting withdrawal of his plea agreement also saying that he was

factually innocent of Count 13. ECF Doc. No. 398.[10] He said the same during his sentencing hearing. ECF Doc. No. 497 at 23:14 to 24:9.

Because of the lengthy sentence that this specific offense entailed, a competent defense would have required particular attention to it, including thorough investigation. Despite this, there is no evidence that Mr. Burrus's counsel performed *any* investigation into this particular offense. This alone is unreasonable. It is particularly unreasonable, though, because Mr. Burrus repeatedly asked his counsel Swanson to obtain a copy of these records: Mr. Burrus began asking about the nature of S.E.'s purported injuries in 2018 after he met "J.S." in jail. J.S. was a purported member of the so-called "Mafia" gang, and the alleged target of the October 4, 2014 shooting for which Mr. Burrus pleaded to attempted assault with a dangerous weapon (Count 11). During their first meeting in or around December 2018 in Allen County Jail, J.S. and Mr. Burrus engaged in friendly discussion.[11] J.S. informed Mr. Burrus that no one was shot on the evening of October 4, 2014. Ex. 1 at ¶ 20. Mr. Burrus informed his counsel of this meeting in a letter written on Christmas Day 2018: "I have been housed with victim (JS) at the Allen County Jail, to explain more I would like to have a face to face." Ex. 13 at 1.

Mr. Burrus was persistent in requesting further investigation of the medical records. He asked Swanson directly about the medical records on January 3, 2020: "I still have not got [sic]

---

[10] Per the Court's April 1, 2021 order, the letter was stricken "though the letter will remain part of the record." ECF Doc. No. 403.

[11] One must wonder why J.S. was allowed to be on the same cell block as Mr. Burrus if the Government thought there was such fervent gang animosity that Mr. Burrus would want him dead.[12] Multiple media reports state that a Fort Wayne police officer named Barry Roos pleaded guilty to theft on January 7, 2016 and received a suspended one-year sentence. Allen County Judge Wendy Davis presided over the case and described Roos as "dishonest" and "immoral." Joe Carroll, *Former Police Officer Apologizes During Sentencing for Theft*, WANE 15 WANE.COM (Mar. 17, 2016), https://www.wane.com/news/former-police-officer-apologizes-during-sentencing-for-theft/.

the medical reports about the shooting victim.  Please do not forget to ask the goverment [sic] for these things."  Ex. 14.  Mr. Burrus asked several more times between January 3, 2020 and his sentencing hearing on August 27, 2021, including in a September 16, 2020 letter:

> I need you to provide me with the hospital records of the alleged victim (S.E.) being shot.  This case is 6 years old I'v [sic] been locked up for 3½ years and I have never seen these records.  I need this information befor [sic] I am sentence [sic].  If the goverment [sic] will not provide me with this very important information I will inform the Judge.  It is my right I believe to have this information.

Ex. 15.  Mr. Burrus's counsel Swanson finally acknowledged these many requests in a letter on September 24, 2020: "I have made the request of the Government for the medical records and I will share them with you, if and when they are provided."  Ex. 16.

However, Swanson never made this request.  Mr. Burrus, desperate and trying to salvage some hope of not spending half of his life in prison, asked for the medical records in open court at his August 27, 2021 sentencing hearing.  "I've been asking my attorney for quite a long time for the medical records of the alleged victim that was shot in this case."  ECF Doc. No. 497 at 23.  Assistant United States Attorney Anthony Geller said that Swanson never requested them: "As far as the medical records, today is the first day anybody has ever even mentioned those.  No attorney has ever asked me for medical records of the victim."  *Id.* at 26.  Were this incorrect, one would assume Mr. Swanson would have spoken up to rebut the claim that no one at all requested the medical records.  He did not.

Swanson's failure to request the alleged victim's medical records prior to Mr. Burrus's plea on March 6, 2020 (and prior to his then-scheduled trial March 12, 2020)—despite his client's persistent urging and despite the massive amount of time incarcerated that Count 13 represented—is clear ineffective assistance of counsel.

Petitioners must meet two prongs to show ineffective assistance in the plea bargain context: (1) counsel did not "attempt to learn the facts of the case and make a good-faith estimate of a likely sentence"; and (2) "his lawyer's deficiency was a decisive factor in [his] decision to plead guilty." *United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir. 1999) (citations and internal quotations omitted).

Counsel's failure to obtain a copy of the alleged victim's medical records constituted ineffective assistance of counsel, because no investigation—let alone a reasonable investigation—was ever conducted by Burrus's counsel. *Martinez*, 169 F.3d at 1053. Counsel Swanson never ever sought out or spoke to S.E. despite Mr. Burrus's many requests. In a June 5, 2019 letter to counsel Swanson, Mr. Burrus said, "You still have not asked the the court for a private investigator so they can go talk to these 'alleged victims.' These are very important for me for this case." Ex. 17. On September 19, 2019, Mr. Burrus said, "I have asked you to speak to these "alleged" victims thru [sic] a private investigator and NONE of these things has happened." Ex. 18 at 1. On October 27, 2019, Mr. Burrus said in a letter to counsel Swanson, "I do want you to go talk to these victims yourself." Ex. 19 at 1.

Mr. Burrus continued to ask his attorney to investigate S.E.'s injuries after he pleaded guilty on March 6, 2020, particularly in the lead up to his sentencing hearing on August 27, 2021. On July 27, 2021, one month before sentencing and long after Mr. Burrus had already pleaded guilty, counsel Swanson for the first time acknowledged the requests: "I am making arrangements to track down [S.E.] and will let you know as to my efforts in that regard. This being seven years ago, I am not optimistic that we can locate her." Ex. 31. In other words, counsel Swanson *for the first time* was attempting to find this key witness—long *after* he had already convinced his client to plead guilty. Failure to properly investigate a crucial witness

constitutes ineffective assistance of counsel. *Adams v. Bertrand*, 453 F.3d 428, 438 (7th Cir. 2006) ("His trial counsel's failure to investigate properly a crucial witness, stemming from an intransigence regarding his trial strategy, however, constituted ineffective assistance of counsel.")

The only available evidence—beyond the Government's own assertions—that S.E. was injured is a piece of paper that Mr. Burrus's counsel first provided to him in or around March 2021. This unverified document appears to be a portion of a police investigation report. According to its apparent author, Detective Barry Roos[12] (Fort Wayne Police Department), S.E. "stated that she was in the living room area and had gotten up to get something to drink when she felt *something* hit her finger." Ex. 32 (emphasis added). It says that her condition was "an A," but there is no explanation of what this means. *Id.* It is also unclear what day Detective Roos spoke with S.E., as the document is dated October 15, 2014 but the shooting happened October 4, 2014. *Id.*

At a minimum, an evidentiary hearing is necessary to discover what evidence there is that the alleged victim was actually shot.

> 2. Swanson Failed to Provide Burrus a Copy of the Medical Records, Despite Multiple Requests, Denying Burrus the Ability to Make an Informed Guilty Plea.

As discussed above, counsel Swanson failed to provide Mr. Burrus with copies of the alleged victim's medical records, largely due to Swanson never adequately investigating the contents or existence of those records. Swanson's failure to respond to Mr. Burrus's request for

---

[12] Multiple media reports state that a Fort Wayne police officer named Barry Roos pleaded guilty to theft on January 7, 2016 and received a suspended one-year sentence. Allen County Judge Wendy Davis presided over the case and described Roos as "dishonest" and "immoral." Joe Carroll, *Former Police Officer Apologizes During Sentencing for Theft*, WANE 15 WANE.COM (Mar. 17, 2016), https://www.wane.com/news/former-police-officer-apologizes-during-sentencing-for-theft/.

the medical records is an additional ground for ineffective assistance of counsel, because it deprived Mr. Burrus of the ability to make an informed guilty plea regarding Count 13 for assault. Where the alleged error at the heart of an ineffective assistance claim is counsel's "failure to investigate or discovery potentially exculpatory evidence," the question of prejudice hinges on "the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill*, 474 U.S. at 59 (citing *Evans v. Meyer*, 742 F.2d 371, 375 (7th Cir. 1984)). This inquiry, in turn, depends "in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Id.*

Here, if the medical records did not show a gunshot injury—or if the medical records did not exist at all—that "evidence likely would have changed the outcome of a trial." *Id.* As a result, counsel's failure to provide Burrus with a copy of the alleged victim's medical records prejudiced his plea agreement because the "ineffective performance affected the outcome of the plea process." *Id.* There is no doubt that had counsel provided Burrus the medical records he requested, and those records not proven the allegations made by the government, "he would not have pleaded guilty and would have insisted on going to trial." *Id.*

C.    **Swanson Gave Burrus Incorrect Advice Regarding Charges and Federal Sentencing**

1.    Facts.

Mr. Burrus accepted the Government's plea deal due to his counsel's miscommunication and potential misunderstanding of what charges Mr. Burrus would plead, as well as a grossly inaccurate calculation of his potential sentence. Counsel explained, and Burrus understood, that pleading guilty to the Government's plea deal would result in a sentence of approximately 10-13 years. Instead, Burrus was ultimately sentenced to 30 years—the result of accepting a plea

agreement that was wrongly explained by counsel, and which led to Burrus involuntarily forfeiting his right to trial.

On February 24, 2020, Swanson informed Mr. Burrus that he had received a plea deal from the Government. He explained the terms as follows: "This plea has you pleading guilty to attempted assault with a dangerous weapon and the 924(c) count. They are dropping the attempting [sic] murder counts and the remaining counts as well." Ex. 3. Mr. Burrus was initial charged with conspiracy (Count 1), attempted murder (Counts 3, 5, and 7), attempted assault with a dangerous weapon (Counts 9 and 11), assault with a dangerous weapon (Count 13), and § 924(c) discharge of firearm (Counts 2, 4, 6, 8, 10, 12, and 14). Mr. Burrus understood Swanson's February 24, 2020 to mean exactly what it says: that he would plead to attempted assault with a dangerous weapon and "the 924(c) count" and the Government would drop attempted murder and "the remaining counts," including conspiracy (Count 1) and assault with a dangerous weapon (Count 13). The maximum sentence for attempted assault with a dangerous weapon under VICAR is three years. 18 U.S.C. § 1959(a)(6). Section 924(c) stipulates that, if a firearm is discharged in the commission of the predicate offense, the defendant is to be sentenced to a minimum of ten years. 18 U.S.C. § 924(c)(1)(A)(iii).

In the same February 24, 2020 letter, Mr. Burrus's counsel said, "It is my view that under *Cureton*, 739 F.3d 1032, the 924(c) counts will merge with the other count." Ex. 3 (referencing *U.S. v. Cureton*, 739 F.3d 1032 (7th Cir. 2014)). In other words, Swanson thought that the three-year maximum sentence for attempted assault with a dangerous weapon would merge with the minimum ten-year sentence for the 924(c) firearms charge, and that these sentences would not run consecutively. Based on a plain reading of this letter, Mr. Burrus believed that he was

pleading guilty to two offenses for which he would be sentenced to a minimum of ten years and a maximum of thirteen years.

Mr. Burrus did not see his attorney or hear anything further from his attorney about the plea deal until they saw each other immediately preceding the March 6, 2020 change of plea hearing. Ex. 1 at ¶ 14. Thus, he did not have the opportunity to ask questions regarding the charges or the potential sentence between February 24 and March 6, 2020. Further, on the day of the hearing, Swanson repeated his understanding that Mr. Burrus was pleading to a likely ten-year sentence, with a thirteen-year maximum. *Id.* Mr. Burrus's investigator Asia Smiley—who was present at the March 6, 2020 hearing—had the same mistaken impression. As stated in her declaration, "It was my understanding that the plea was for 10 years." Ex. 2 at ¶ 5.

However, this is not what happened. Swanson's assertion that the Government would "drop[] . . . the remaining counts" was incorrect. Unbeknownst to Mr. Burrus, his plea deal included pleading guilty to assault with a dangerous weapon (Count 13)—a criminal offense that carries a maximum twenty-year sentence. This was never Mr. Burrus's intent.

Mr. Burrus attempted to remedy this misunderstanding. In a January 28, 2021 letter, Mr. Burrus wrote counsel Swanson, "[M]y last letter I asked you should I withdraw my guilty plea because I am still being charged with dismissed charges and you never answered my question." Ex. 5 at 2.[13] Frustrated by the lack of movement and with his counsel generally, including because he had once again not seen his counsel for quite some time, Mr. Burrus filed a letter with the Court on March 30, 2021 requesting withdrawal of his plea agreement. The letter asserted that he was factually innocent of Count 13. ECF Doc. No. 398.[14]

---

[13] We have been unable to locate the "last letter" Mr. Burrus referenced.

[14] Per the Court's April 1, 2021 order, the letter was stricken "though the letter will remain part of the record." ECF Doc. No. 403.

Mr. Burrus continued asking Swanson to help him get out of a plea deal that he did not understand. Burrus wrote Swanson in a June 29, 2021 letter:

> I honestly need you to tell the Judge at my sentencing that you advised me that I would only get 10-13 years in prison. I understand that you had no controll [sic] over the attemted [sic] murder but I would not have signed the plea if you did not tell me that so I am asking as my lawyer to state for the record that this conversation took place.

Ex. 8. Then, in a July 20, 2021 letter, Mr. Burrus said, "*I'm trying to make sense of what I pled guilty to*." Ex. 9 (emphasis added).[15]

Mr. Burrus again asserted his factual innocence of assault with a dangerous weapon during his sentencing hearing, but of course at this point it was too late. ECF Doc. No. 497 at 23:14 to 24:9.

Counsel Swanson did file a sentencing memorandum on September 18, 2020 that attempted to explain the mistake, to an extent, but the text showed continued confusion on Mr. Swanson's part. ECF Doc. No. 374. The memorandum said:

> "Counsel for the Government and Burrus subsequently arrived at an agreement where Burrus would plead to *attempted aggravated battery* as a factual predicate to his plea. The Government's attorney sought permission from his superiors to amend the plea to *attempted aggravated battery*. Counsel explained the ramifications of this plea to his client and the benefits too. A plea was subsequently entered pursuant to the *aggravated battery* predicate."

*Id.* at 1 (emphasis added). There were several problems here. First, counsel Swanson was still confused about what Mr. Burrus was pleading to. He said that the Government amended the plea to "attempted aggravated battery."[16] Again, this was one portion of the plea—two counts of

---

[15] This letter is dated "7-20-19" but references a "6-29-21" letter. Its envelope appears to say "23 JUL 2021" as well.

[16] Presumably Mr. Swanson meant "attempted assault with a dangerous weapon." Neither the indictment nor 18 U.S.C. § 1959 use the terms "aggravated" or "battery." The Federal Sentencing Guidelines similarly do not use the phrase "aggravated battery."

attempted assault with a dangerous weapon—but the text of the plea also included assault with a dangerous weapon.  Second, but similarly, Mr. Swanson's memorandum said that the predicate was both "attempted aggravated battery" (see the first sentence quoted above) and "aggravated battery" (see the final sentence quoted above)—seemingly using the phrases interchangeably.

Although similarly worded, "attempted assault with a dangerous weapon" and "assault with a dangerous weapon" carry major differences under the Violent Crimes in Aid of Racketeering Activity statute.  18 U.S.C. § 1959(a)(3) & (6).  Attempted assault with a dangerous weapon under § 1959(a)(6) carries a maximum term of three years.  Assault with a dangerous weapon under § 1959(a)(3), however, carries a maximum term of *twenty* years.  An evidentiary hearing to examine how counsel Swanson "explained the ramifications of this plea to his client" would be illuminating.  ECF Doc. No. 374 at 1.

The other error made clear in the September 18, 2020 sentencing memorandum was Mr. Swanson's belief that—because Mr. Burrus did not plead to attempted murder—it could not be used for the "underlying crime or racketeering activity" base offense level calculation under the VICAR Sentencing Guidelines.  U.S.S.C. Guidelines Manual § 2E1.3.  The Government told the probation officer examining the issue that sentencing should be "computed pursuant to the attempted murder guidelines."  ECF Doc. No. 374 at 2.  The memorandum continued, "This was not Burrus['s] understanding of the plea nor was it the factual plea that was explained by counsel to him."  *Id.*  Mr. Burrus would not have accepted the plea deal had its terms and implications been properly understood by his counsel and properly conveyed to him.

2.    Analysis.

"In order to demonstrate ineffective assistance of counsel in the context of a guilty plea, [defendant] must demonstrate that his counsel's advice regarding the plea was objectively unreasonable and that there is a reasonable probability that, but for counsel's error, [defendant]

would not have pled guilty, but would have insisted upon a trial." *Moore v. Bryant*, 348 F.3d 238, 241 (7th Cir. 2003) (citing *Hill*, 474 U.S. at 59; *Strickland*, 466 U.S. 668). "A reasonably competent counsel will attempt to learn all of the facts of the case, make an estimate of a likely sentence, and communicate the results of that analysis before allowing his client to plead guilty." *Id.* (citing *United States v. Barnes,* 83 F.3d 934, 939 (7th Cir. 1996)). "Although the attorney's analysis need not provide a precisely accurate prediction of the respective consequences of pleading guilty or going to trial, the scrutiny must be undertaken in good faith." *Id.* (quoting *Barnes*, 83 F.3d at 939-40). "When the attorney fails to do so and that failure is the decisive factor in the decision to plead guilty, the Sixth Amendment is violated and the defendant may withdraw his plea." *Id.* (citing *Barnes* at 940).

Here, counsel's failure to reasonably educate himself on the Government's plea deal and its implications was the decisive factor in Burrus's guilty plea, and but for counsel's imparting of this incorrect information, Burrus would have exercised his right to trial. Ex. 1 at ¶ 18. Burrus's counsel admitted that he had mistakenly calculated the prison sentence Burrus would face if he pleaded guilty. Ex. 33 at ¶¶ 6-8. From those facts alone, Burrus has "establish[ed] that there was a reasonable probability that, but for the erroneous advice, he would not have plead guilty." *Moore*, 348 F.3d at 242 (citing *Hill*, 474 U.S. at 59).

Burrus's ineffective assistance of counsel claim is analogous to that in *Moore*, where the defendant similarly pleaded guilty based upon an inaccurate sentencing calculation by counsel:

> His attorney's advice dramatically altered the choice faced by Moore. Instead of serving 10 years if he pled guilty, or 12 ½-15 if he lost at trial, Moore was presented with the prospect of serving 10 years if he pled guilty or 22-27 years if he was convicted at trial. That difference nearly doubled the amount of time he would face if he proceeded to trial, and that is precisely the type of information that is likely to impact a plea decision.

*Id.* at 242-43. Similar to *Moore*, Burrus also maintained his innocence and only accepted the plea deal because counsel informed him that he would have received a 10-13 year sentence. Ex. 1 at ¶ 17. Instead, the Court sentenced him to a 30-year sentence.

Mr. Burrus had told his attorney that he would entertain a plea offer for 60-84 months. Exs. 17 and 20. When Assistant United States Attorney Geller said he was seeking a plea deal in the "20 year range," counsel Swanson did not even ask whether Mr. Burrus would accept because he knew he would not. "As you can appreciate," Swanson said, "I did not agree with his assessment. I believe we can do better. I will keep working on your behalf." Ex. 21. In case there was any doubt, Mr. Burrus replied, "20 years is definately [sic] something I'm not willing to take." Ex. 18. On March 3, 2021, Mr. Burrus wrote Mr. Swanson, "On 3-6-20 I told you before I walked in that court room if I was getting 30 years in prison then I was going to trial because I am not a gang member. You told me that would not happen." Ex. 6. at 1. But for counsel's inaccurate explanation of the plea agreement and faulty sentence prediction, Mr. Burrus never would have pleaded guilty—he would have instead gone to trial.

The District Court did admonish and instruct Burrus during his sentencing hearing. However, this does not remedy the errors of Burrus's counsel, and does not affect his ineffective assistance of counsel claim. Although Burrus acknowledged his rights when he pleaded guilty , and further acknowledged that the District Court's sentence need not conform to the United States Sentencing Guidelines, *see* Sept. 09, 2020, Hr'g Tr. (the "Plea Hearing") 28:18-29:4, Burrus's responses concerning the voluntariness of his plea and his acknowledgement of his rights do nothing to address the underlying problem" because he "was not aware that [Swanson's] sentence advice was erroneous." *Moore*, 348 F.3d at 243. That is largely because nothing within Burrus's plea colloquy addressed the length of the sentence "that he was likely to

face if he went to trial and lost." *Id.* Further, "that sequence of questions did nothing to ameliorate the adverse impact of his counsel's misinformation." *Id.*

Burrus's counsel at no point conducted a reasonable inquiry regarding Burrus's prospective sentence under the Government's plea agreement, and the prediction made by counsel was grossly inaccurate. During Burrus's plea negotiations and sentencing, Burrus's counsel did not meet the Seventh Circuit's standard for competent assistance. *See Julian v. Bartley*, 495 F.3d 487, 495 (7th Cir. 2007) ("A reasonably competent attorney will attempt to learn all of the facts of the case, make an estimate of the likely sentence, and communicate the result of that analysis before allowing the client to plead guilty.") (citing *Bethel v. United States,* 458 F.3d 711, 717 (7th Cir. 2006)). Factoring in "the magnitude of the error into its assessment of whether legal advice was that of a reasonably competent attorney" shows that Burrus was misled by his counsel, and as a result received a sentence almost two decades longer than he expected. *Id.*

### 3. Alternatively, Swanson Failed to Provide Any Sentencing Prediction.

As previously stated, and buttressed by contemporaneous evidence, Mr. Burrus's counsel informed him that he was facing a 10-13 year sentence. Mr. Burrus said this, among other times and places, on August 27, 2021 at his sentencing hearing: "[My attorney] told me before on March 6, 2020, that I would be sentenced to 10 to 13 years." ECF Doc. No. 497 at 19:8-9. Prior to having the contextual evidence, the Court replied, in part:

> I asked you quite clearly . . . whether anyone had made any promises or predictions to you as to what sentence you would receive, and you answered that question 'No' under oath, and I see little reason to deviate from that now under oath here, given your statement at the plea. In fact, I credit your first statement at the time of the plea.

*Id.* at 27:23 to 28:4. Here, Petitioner now argues in the alternative, that if Mr. Burrus's counsel had not provided a prediction regarding sentence length prior to the plea, Mr. Burrus's counsel

would have rendered ineffective assistance of counsel under Seventh Circuit jurisprudence. To wit, *Moore v. Bryant* held, "A reasonably competent counsel will attempt to learn all of the facts of the case, *make an estimate of a likely sentence*, *and communicate the results of that analysis* before allowing his client to plead guilty." 348 F.3d at 241 (citing *United States v. Barnes*, 83 F.3d 934, 939 (7th Cir. 1996)) (emphasis added). The Seventh Circuit previously articulated this stance in *United States v. Martinez*, where it said that in order to find a counsel's performance was not objectively unreasonable, counsel must "attempt to learn the facts of the case and *make a good-faith estimate of a likely sentence*." 169 F.3d at 1053 (7th Cir. 1999) (citing *Hill* 474 U.S. at 56-60) (emphasis added).[17]

The second prong of the *Hill* standard is that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." 474 U.S. 52, 59 (1985). As previously stated, an examination of Mr. Burrus and his counsel Swanson's correspondence to one another shows that, in this alternative scenario where Swanson did not provide a prediction of the sentence that Mr. Burrus could anticipate, there is also no chance Mr. Burrus would have pleaded guilty and foregone going to trial. The letters show Mr. Burrus was hesitant to enter a guilty plea and was very focused on the length of time he could anticipate going to prison. Mr. Burrus wrote his counsel on July 28, 2019, saying, "I have claimed my innocents [sic] and have asked to proceed to trial but this case is taking forever. Go speak with [AUSA] Tony Geller and tell him I

---

[17] These and other Seventh Circuit cases use the terms "estimate" and "prediction" interchangeably in this context. *See, e.g.*, *Moore*, 348 F.3d at 241-43 ("Although the attorney's analysis need not provide a precisely accurate prediction of the respective consequences of pleading guilty or going to trial, the scrutiny must be undertaken in good faith."); *Julian* 495 F.3d at 495 (quoting *Martinez*, 169 F.3d at 1053 ("[A]lthough a mistaken prediction is not sufficient to show deficient performance, (citation omitted) in some cases it may be such a gross mischaracterization that it provides a 'strong indication of constitutionally deficient performance.'"); *Barnes*, 83 F.3d at 938 ("[H]e contends that his plea is invalid because his own counsel provided him ineffective assistance by offering him an inaccurate prediction of his sentence before the change of plea hearing.")

would agree to a plea of 60-84 months binding." Ex. 20. In his August 6, 2019 reply letter, counsel Swanson said, "I communicated your offer of 60 to 84 months. He indicated that was not acceptable and that he was looking for a plea in the 20 year range. As you can appreciate, I did not agree with his assessment. I believe that we can do better. I will keep working in your behalf." Ex. 21. Mr. Burrus replied on September 19, 2019, saying, "20 years is definately [sic] something I'm not willing to take." Ex. 18. Further, Mr. Burrus mentioned getting ready for trial on many occasions, and was disappointed with the many continuances that he endured, as will be further examined in Subsection F below. The notion that he would have given up his constitutional right to trial in lieu of a favorable prediction of the amount of time he faced is inconceivable.

### D.     Swanson Failed to Present Any Mitigation Evidence at Sentencing

During the sentencing hearing, Burrus's counsel was again ineffective because he did not present *any* mitigating facts, evidence, or testimony during that hearing. Courts typically apply the *Strickland* standard for ineffective assistance of counsel during a defendant's sentencing hearing. *Miller v. Martin*, 481 F.3d 468, 472 (7th Cir.) (per curiam), *as amended*, 223 F. App'x 489 (7th Cir. 2007). The Seventh Circuit also holds that "in certain types of cases, prejudice is 'so likely that case-by-case inquiry into prejudice is not worth the cost,' and so it is presumed." *Id.* (quoting *Strickland*, 466 U.S. at 692). "This occurs when (1) the defendant 'is denied counsel at a critical stage'; (2) counsel 'entirely fails to subject the prosecution's case to meaningful adversarial testing'; or (3) counsel is called upon to represent a client in circumstances under which no lawyer could provide effective assistance." *Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 659-61 (1984)).

Here, while counsel's representation may not have fallen so low as to come under *Cronic*'s second prong—where counsel *entirely* fails to subject the prosecution's case to

meaningful adversarial testing—the actions by Burrus's counsel nonetheless fell below an objective standard of reasonableness. There were multiple instances where counsel should have presented evidence during Burrus's sentencing hearing that may have materially impacted his sentence.

*First*, counsel failed to present testimony concerning Burrus's childhood and upbringing. Counsel also failed to raise Burrus's mental health struggles at the time of his participation in the so-called 2500 gang, including an undiagnosed anxiety disorder. The Sixth Amendment requires that counsel conduct reasonable investigations into a defendant's background. *Strickland*, 466 U.S. at 690-91. Further, the Seventh Circuit holds that counsel is ineffective during sentencing phases when no investigation into mitigating evidence or circumstances is conducted by counsel. *See Emerson v. Gramley*, 91 F.3d 898, 906 (7th Cir. 1996) (granting habeas petition where counsel "had failed to conduct *any* investigation, however brief, into the possible existence of evidence of mitigating circumstances") (emphasis in original).

*Second*, Mr. Burrus's counsel failed to introduce any witnesses to testify at his sentencing hearing. There is no evidence that counsel investigated and prepared potential character witnesses. The Seventh Circuit holds that defense counsel's failure to present available character witnesses may fall outside of *Strickland*'s range of professionally competent assistance. *See Kubat v. Thieret*, 867 F.2d 351, 368 (7th Cir. 1989) (holding that counsel's failure to provide mitigating evidence at sentencing, despite availability of character witnesses, "amounted to no representation at all"). Here, Burrus's counsel failed to introduce any meaningful character witness testimony during his sentencing hearing, and similarly fell below the threshold for ineffective assistance of counsel. The record shows the availability of at least one character witness—Mr. Burrus's mother—who spoke at the Court's discretion but had not been prepared

or presented as a character witness. ECF Doc. No. 497 at 6:21, 9:11 to 12:23, 48:22 to 49:16. Mr. Burrus's sister also drove a long distance to be at the sentencing hearing and was similarly not called. *Id.* at 7:12 to 8:23. The existence of further character witnesses is unknown due to the aforementioned lack of investigation into the same by Mr. Burrus's counsel.

###    E.    Swanson Rarely Visited Burrus in Prison

Finally, counsel Swanson rarely visited his client Mr. Burrus, which compounded several of the aforementioned examples of ineffective assistance of counsel. To the best of his recollection, Mr. Burrus said his attorney visited him approximately five times, each time for about 20 minutes, over a period of three years of representation. Ex. 1 at ¶ 5. Mr. Burrus would not see his attorney for many months at a time—despite Mr. Burrus requesting to see him face-to-face on numerous occasions. *Id.* at ¶ 6.

In multiple letters before his guilty plea, Mr. Burrus asked for face-to-face meetings with Swanson to discuss aspects of his case. Ex. 22 ("I have information on [the confidential informant] that I rather not say in a letter . . . . If you could come see me A.S.A.P. that would be great."); Ex. 13 at 1 (". . . I would like to have a face to face"); Ex. 23 ("[O]n another note I would like to discus [sic] a factual defense face to face so if you could come see me at the Allen County Jail A.S.A.P. We do have trial in less than 30 days."); Ex. 24 ("[T]here are many things we need to discuss that I do not feel comfortable writting [sic] on paper . . . . I would like to discuss this matter more in person . . . . Please come to the jail to see me.") As time passed, Burrus's letters became more frustrated with his counsel's absence. On September 19, 2019, Mr. Burrus wrote his attorney:

> In my last 5 letters I have asked you to come to the Allen County Jail so we can discuss important FACTS about my case, things that I need done befor [sic] trial . . . . I don't feel you are representing me to your best ability and if you feel that the things I am asking of you can't be done then I advise you to withdraw from my case because I can't seem to understand as my lawyer when I ask[ed] . . . . you to

come see my at the jail you never come. How are you preparing for my case when you don't even discuss things with your client . . . .

Ex. 18 at 1-2.

Then on February 9, 2020, a month before his then-scheduled trial, Mr. Burrus said to his

attorney:

> I have yet to see you or get anything in the mail from you about my defense, our strategy, or what angle we are coming at trial. . . . There are things we need to go over so I should be seeing you soon.

Ex. 25.

These letters make clear Mr. Burrus's wholly understandable frustration with his attorney, pleading to meet face to face so that he can actually understand what was going on in this case. Despite this, counsel Swanson insisted on continuing to communicate with his client almost entirely through letters. Mr. Burrus was clearly having trouble understanding the proceedings against him. Further, Mr. Burrus was reticent to disclose sensitive information through letters, in part because he believed the jail was reading and copying his legal mail. Ex. 5 at 1-2. Correspondence communication was wholly inadequate and amounted to deficient counsel.

After Burrus's plea, Swanson's failure to meet with Burrus continued. Mr. Burrus said in his August 27, 2021 sentencing hearing that he did not have the opportunity to speak to his counsel in person regarding the presentencing investigation report ("PSI"). When the Court asked if he had the opportunity to review the PSI with counsel Swanson, Mr. Burrus said, "Not necessarily – not like together, no." ECF Doc. No. 497 at 15:6-7. The Court asked if he had the opportunity to ask his attorney questions about the report, Mr. Burrus said, "I have wrote him letters, but I never – I never talked to him directly about the PSI." *Id.* at 15:10-11. The Court asked counsel Swanson the same question, but he gave an unclear answer. When asked if he

spoke to Mr. Burrus about the PSI, he said "I was" but then "It was all in writing. And given the history of this case, I thought it more appropriate to do it in writing." *Id.* at 15:23 to 16:2. Mr. Burrus then said, "He never answered my question of what I'm asking him to do." *Id.* at 16. To reiterate, Mr. Burrus pleaded with his counsel to visit him because he didn't understand the report: "You need to come see me at the jail and explain to me what's going on . . . . You need to come see me ASAP . . . . I don't want no more letters thru [sic] the mail . . . . I don't understand this PSI AT ALL!!!" Ex. 26.[18]

### F. Swanson Allowed Continuances Despite Burrus's Many Requests for a Speedy Trial

Mr. Burrus consistently stated that he wanted to go to trial as soon as possible, filing motions for a speedy trial and telling Mr. Swanson—and prior counsel William Lebrato before him—that he did not want him to agree to continuances. During his initial appearance on August 2, 2017, Mr. Burrus requested a speedy trial. ECF Doc. No. 53. At his arraignment two days later, Mr. Burrus again requested a speedy trial. ECF Doc. No. 58. On September 1, 2017, Mr. Burrus filed a motion for a speedy trial. ECF Doc. No. 68. On September 13, 2017, the Court granted this motion insofar as the trial date had already been set within 70 days, starting January 8, 2018. ECF Doc. No. 70. On August 13, 2019, Mr. Burrus filed a letter with the Court objecting to the many continuances in the case. ECF Doc. No. 220.[19]

---

[18] The Court did ask Mr. Burrus if he had any questions for Mr. Swanson regarding the report, and Mr. Burrus said no. ECF Doc. No. 497 at 16:21 to 17:1. We respectfully contend, though, that Mr. Burrus having the opportunity to ask questions in person for the first time not only on the day of the hearing but during the hearing itself would have been an inadequate remedy to counsel Swanson's absent representation.

[19] Per October 4, 2019 order, this letter was stricken although it was to remain a part of the record. ECF Doc. No. 227.

On November 1, 2019, counsel Swanson wrote Mr. Burrus, "I have also conferred with new counsel for [codefendant Demetri] Beachem and indicated that we would not agree to any continuances.  He understands our position."  Ex. 27.  On November 6, 2019, Mr. Beachem's new counsel filed a motion to continue jury trial, saying, *inter alia*, "Counsel for Defendant [Demetri] Beachem has discussed the request for a continuance with co-counsel for all three (3) co-defendants, and *they do not object to any such request*."  ECF Doc. No. 237 at 2 (emphasis added).  The Court agreed to this continuance on November 12, 2019, resetting the December 2, 2019 jury trial for March 16, 2020.  Mr. Burrus, confused and once again disappointed to learn his trial had been continued, wrote counsel Swanson on November 11, 2019:

> I am writting [sic] about the continuances that was [sic] filed on 11-6-19.  I never gave consent for this.  I never agreed to this and as my lawyer you never visited me at the Allen County Jail to inform of this information and never have for any of the others.  On top of that you sent me a letter on the date of November 1, 2019 informing me that we were trial ready and would not agree to any continuances . . . . I would like you to file on my behalf a motion objecting to the continuance.

Ex. 28.  Counsel Swanson responded November 18, 2019, saying:

> I did not move to have your case continued.  I did, however, communicate with you previously that when a new lawyer entered the case that we could expect a continuance.  That indeed happened.  Because you are joined in the same litigation, it does not matter whether or not you agree to the continuance.  I did not ask you to agree to the continuance nor did I seek the continuance.

Ex. 29.  Mr. Swanson notably did not admit that he had not in fact objected to the continuance— after telling Mr. Burrus in the November 1, 2019 letter that he had.  Because of Mr. Swanson's deceit, there was the subsequent breakdown in trust between Mr. Burrus and his counsel. Understandably concerned that his counsel was not serving his best interests, Mr. Burrus filed several pro se letters and motions with the Court over the next two months.  ECF Doc. Nos. 241, 242, 250, 254, and 265.  The lack of honest communication and the aforementioned lack of face-to-face visits tainted the attorney-client relations, making effective counsel impossible—as

evidence by misinformation and misunderstandings that came in and around the change-of-plea hearing on March 6, 2020.

## IV.   APPEAL WAIVER

### A.   The Appeal Waiver in Burrus's Plea Agreement Does Not Preclude This Petition

Mr. Burrus's plea agreement contains an appeal waiver; however, the appeal waiver contains an explicit carveout for ineffective assistance claims.  ECF Doc. No. 295.  Even if the appeal waiver contained no such carveout, Seventh Circuit precedent demands one.  *See Hurlow v. United States*, 726 F.3d 958, 964 (7th Cir. 2013) ("We have therefore repeatedly recognized that appellate and collateral review waivers cannot be invoked against claims that counsel was ineffective in the negotiation of the plea agreement.").  Therefore, Mr. Burrus's appeal waiver does not bar this ineffective assistance claim.

In addition, when considering Mr. Burrus's petition, we ask that the Court view statements made by Mr. Burrus at his plea colloquy as "made against the backdrop" of his attorney's ineffective assistance.  *Hurlow*, 726 F.3d at 968.  In *Hurlow*, the defendant pleaded guilty to multiple drug and firearm offenses after law enforcement searched his home.  *Id.* at 961-62.  The defendant informed his attorney that he had objected to this warrantless search; however, his attorney failed to investigate the events surrounding the search and instead convinced him to plead guilty.  *Id.*  On appeal, the Seventh Circuit disregarded statements Hurlow made during his plea colloquy because they were "made against the backdrop of his ignorance regarding the possibility of a successful motion to suppress."  *Id.* at 968.  The Seventh Circuit held that even a plea that complies with Rule 11 "cannot be 'knowing and voluntary' if it resulted from ineffective assistance of counsel."  *Id.* at 967.  Hurlow's ineffective assistance claim was remanded to the District Court for an evidentiary hearing.  *Id.* at 968.

Like the defendant in *Hurlow*, Burrus's statements at his plea colloquy were made against the backdrop of his attorney's ineffective assistance. As previously stated and argued, Burrus accepted a plea because (1) counsel informed him incorrectly that some of his codefendants would testify against him and (2) counsel provided grossly inadequate guidance vis-à-vis charges and sentencing. Every statement made during the plea colloquy came in the wake of counsel Swanson's inadequate representation.

Further, and more directly on point here, Mr. Burrus's counsel advised him not to disagree with the judge during his colloquy because he could lose a potential sentence reduction. Ex. 1 at ¶ 15. Mr. Burrus viewed the plea agreement for the first time just prior to his hearing, was told by his attorney that he faced 10-13 years, and believed incorrectly that two of his codefendants were cooperating with the Government against him. Scared and misinformed, Mr. Burrus took his attorney's advice and kept his mouth shut except to agree with what was being said in Court.

Mr. Burrus's counsel also did not explain the appeal waiver to his client. Ex. 1 at ¶ 13. To reiterate, Mr. Burrus did not have adequate time to review the plea agreement generally. At this sentencing hearing, after the Court asked his attorney about the waiver of appeal, Mr. Burrus asked, "When you say waive my right to appeal, what does that mean?" ECF Doc. No. 497 at 59:14-15.

What is more, it appears that counsel Swanson himself did not understand the plea waiver. In a March 23, 2021 letter, counsel Swanson wrote Mr. Burrus that the Court had rejected their arguments against using attempted murder at the base offense. Counsel Swanson then said, "However, we will be free, after sentencing, to argue this matter on appeal." Ex. 30.

Counsel Swanson did not understand the appeal waiver and did not ensure his client understood the waiver before advising his client to plead guilty. This specific instance coupled with the general ineffective assistance afforded Mr. Burrus necessitate a finding that he did not make an informed decision to waive his right to appeal.

Should the Court rule that the appeal waiver is void due to ineffective assistance of counsel, we incorporate and repeat here all facts and arguments made in Mr. Burrus's direct appeal before the Seventh Circuit. *United States v. Burrus*, No. 21-2671, App. Br. (7th Cir. Apr. 13, 2022).

## V.  REMEDY

### A.  Burrus Is Entitled to Vacatur or, At Least, an Evidentiary Hearing

As described above, Burrus received ineffective assistance of counsel and, therefore, his Sixth Amendment rights were violated. *See Strickland*, 466 U.S. at 684-85. Under such circumstances, Burrus is entitled to have his sentence "vacate[d], set aside or correct[ed]." 28 U.S.C. § 2255(a). While the District Court has "considerable discretion in fashioning a remedy appropriate under the circumstances," *United States v. Day*, 969 F.2d 39, 47 (3d Cir. 1992), the appropriate remedy here is to vacate Burrus's sentence and conviction and allow him to contest the charges against him. *See Lee v. United States*, 113 F.3d 73, 77 (7th Cir. 1997).

In the alternative, Burrus is entitled to an evidentiary hearing on his claim of ineffective assistance of counsel. He has alleged "facts that, if proven, would entitle him to relief." *Gaylord v. United States*, 829 F.3d 500, 506 (7th Cir. 2016) (quoting *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001)); *Anderson v. United States*, 981 F.3d 565, 578 (7th Cir. 2020) ("Ineffective assistance claims often require an evidentiary hearing to develop the record more fully."). An evidentiary hearing should be denied only if the "files and records of the case *conclusively show* that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b) (emphasis

added).  That is not the case here.  Instead, Burrus "has alleged sufficient facts to warrant an evidentiary hearing on his ineffective assistance of counsel claim." *Anderson*, 981 F.3d at 578. Accordingly, Burrus is entitled to an evidentiary hearing should the Court not find that vacatur is not warranted.

## VI.    CONCLUSION

Mr. Burrus respectfully requests that the court GRANT his petition to vacate, set aside, or correct his conviction and sentence.  In the alternative, Mr. Burrus requests that the Court order an evidentiary hearing on his claims of ineffective assistance of counsel.

Dated:  February 12, 2024                                    Respectfully submitted,

                                          By:  */s/ Robert M. Kimmitt, Jr.*
                                                Robert M. Kimmitt, Jr.
                                                robert.kimmitt@kirkland.com
                                                KIRKLAND & ELLIS LLP
                                                1301 Pennsylvania Avenue, N.W.
                                                Washington, D.C. 20004
                                                Telephone: (202) 389-5000
                                                Fax: (202) 389-5200

                                                *ATTORNEY FOR PETITIONER*
                                                *RONNIE BURRUS*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 12th day of February 2024, he caused 1 copy of the Petitioner Ronnie Burrus's Motion Pursuant to 2255 to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody to be served via Federal Express Overnight delivery upon the following:

Anthony W. Geller, AUSA
United States Attorney's Office
3128 Federal Building
1300 South Harrison Street
Fort Wayne, IN 46802

/s/ Robert M. Kimmitt, Jr.
Robert M. Kimmitt, Jr.

**INDEX OF EXHIBITS**

Ex. 1 – Declaration of Ronnie Burrus

Ex. 2 – Declaration of Asia Smiley

Ex. 3 – Feb. 24, 2020 Letter from D. Swanson to R. Burrus

Ex. 4 – Feb. 24, 2020 Letter from D. Swanson to R. Burrus

Ex. 5 – Jan. 28, 2021 Letter from R. Burrus to D. Swanson

Ex. 6 – Mar. 3, 2021 Letter from R. Burrus to D. Swanson

Ex. 7 – Mar. 19, 2021 Letter from R. Burrus to D. Swanson

Ex. 8 – Jun. 29, 2021 Letter from R. Burrus to D. Swanson

Ex. 9 – Jul. 20, 2021 Letter from R. Burrus to D. Swanson

Ex. 10 – Mar. 12, 2019 Letter from D. Swanson to R. Burrus

Ex. 11 – Feb. 1, 2024 Emails between M. Linsky and R. Kimmitt

Ex. 12 – Sept. 26, 2019 Letter from D. Swanson to R. Burrus

Ex. 13 – Dec. 25, 2018 Letter from R. Burrus to D. Swanson

Ex. 14 – Jan. 3, 2020 Letter from R. Burrus to D. Swanson

Ex. 15 – Sept 16, 2020 Letter from R. Burrus to D. Swanson

Ex. 16 – Sept. 24, 2020 Letter from D. Swanson to R. Burrus

Ex. 17 – Jun. 5, 2019 Letter from R. Burrus to D. Swanson

Ex. 18 – Sept. 19, 2019 Letter from R. Burrus to D. Swanson

Ex. 19 – Oct 27, 2019 Letter from R. Burrus to D. Swanson

Ex. 20 – Jul. 28, 2019 Letter from R. Burrus to D. Swanson

Ex. 21 – Aug. 6, 2019 Letter from D. Swanson to R. Burrus

Ex. 22 – Nov. 15, 2018 Letter from R. Burrus to D. Swanson

Ex. 23 – Jan. 27, 2019 Letter from R. Burrus to D. Swanson

Ex. 24 – Mar. 28, 2019 Letter from R. Burrus to D. Swanson

**Ex. 25 – Feb. 9, 2020 Letter from R. Burrus to D. Swanson**

**Ex. 26 – Undated Letter from R. Burrus to D. Swanson**

**Ex. 27 – Nov. 1, 2019 Letter from D. Swanson to R. Burrus**

**Ex. 28 – Nov. 11, 2019 Letter from R. Burrus to D. Swanson**

**Ex. 29 – Nov. 19, 2019 Letter from D. Swanson to R. Burrus**

**Ex. 30 – Mar. 23, 2021 Letter from D. Swanson to R. Burrus**

**Ex. 31 – Jul. 27, 2021 Letter from D. Swanson to R. Burrus**

**Ex. 32 – Oct 15, 2014 Police Investigation Report**

**Ex. 33 – Declaration of Brett Wessley**